1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                       **DISTRICT OF OREGON**

8                       **PORTLAND DIVISION**

9

10

11 **CHERYL E. GILINSKY,**                    No. 3:11-cv-00820-HU

12              Plaintiff,                    **FINDINGS AND**
                                             **RECOMMENDATION**
13     vs.

14 **MICHAEL J. ASTRUE,**
   Commissioner of Social Security,
15
              Defendant.
16 _____

17 Lisa R. Porter
   KP Law LLC
18 16200 SW Pacific Hwy, Suite H-233
   Portland, OR 97224
19
20     Of Attorney for Plaintiff

21 S. Amanda Marshall
   United States Attorney
   District of Oregon
22 Adrian L. Brown
   Assistant United States Attorney
23 1000 SW Third Avenue, Suite 600
   Portland, OR 97204-2902
24
   Kathryn Ann Miller
25 Special Assistant United States Attorney
   Office of the General Counsel
26 Social Security Administration
   701 Fifth Avenue, Suite 2900, M/S 221A
27 Seattle, WA 98104-7075

28     Of Attorneys for Defendant

Page 1 - FINDINGS AND RECOMMENDATION

**HUBEL, J.,**

Plaintiff Cheryl Gilinsky ("Gilinsky") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Following a careful review of the record, I conclude that the Commissioner's decision should be **AFFIRMED**.

## I.   PROCEDURAL BACKGROUND

Gilinsky applied for DIB and SSI benefits in November 2007.  Both of Gilinsky's applications alleged disability beginning December 31, 2000.  The applications were denied initially and upon reconsideration.  Gilinsky appeared and testified at a hearing held on March 18, 2010, before an Administrative Law Judge ("ALJ").  The ALJ issued a decision denying Gilinsky's claim for benefits on May 19, 2010.  Gilinsky timely requested review of the ALJ's decision, which was denied by the Appeals Council on May 13, 2011.  As a result, the ALJ's decision became the final decision of the Commissioner that is subject to judicial review.  This appeal followed on July 6, 2011.

## II.   FACTUAL BACKGROUND

**A.   Medical Evidence, Consultants' Reports, and Written Testimony**

On February 14, 2005, Gilinsky was taken to the emergency room at Providence Medford Medical Center where she was treated for kidney pain and vomiting.  The report prepared by Patrick Moore, M.D., states: "This patient remained stable throughout her emergency room stay.  She has tenderness in her low back on

Page 2 - FINDINGS AND RECOMMENDATION

1  palpation over her sacroiliac and paravertebral muscles. . . . She
2  is requesting pain medicine.  I am going to go ahead and give her
3  a  shot  of  morphine  and  Phenegran,  [and]  a  prescription  for
4  Percocet." (Tr. 544.)  Dr. Moore's diagnostic impression included
5  diagnoses of "[m]usculoskeletal low back pain with a history of
6  fibromyalgia" and "[m]icroscopic hematuria."  (Tr. 544.)

7       On March 4, 2005, Gilinsky was taken to the emergency room at
8  Providence Medford Medical Center where she was treated for "nausea
9  and vomiting and abdominal pain with diarrhea."  (Tr. 537.)  At
10 that time, Gilinsky was "adamant about her motivation to quit
11 drinking" and planned "to attend AA meetings . . . [even though]
12 her husband is an alcoholic and will continue to drink."  (Tr.
13 537.)  Gilinsky was prescribed, among other things, forty tablets
14 of Percocet.

15      On July 14, 2005, Gilinsky was treated at Providence Medford
16 Medical Center for "[r]ight low back pain with right sciatica," a
17 "[l]eft renal stone," and "[c]hronic pancreatitis."  (Tr. 531.)
18 Gilinsky was "provided with a total of 8 mg of morphine during her
19 stay in the Emergency Room" and "a prescription of Percocet[.]"
20 (Tr. 530.)

21      On September 30, 2005, Gilinsky was taken to the emergency
22 room at Providence Medford Medical Center where she was treated for
23 abdominal pain.  Under the "Medical Decision Making" section of his
24 report, Alfred Sakradse, M.D., stated: "The patient presents with
25 probable alcoholic gastritis, with epigastric pain and vomiting,
26 with daily drinking for the past several weeks. . . . After patient
27 was given antiemetics . . . she was able to eat a full liquid meal
28 without any further vomiting. . . . The patient therefore will be

Page 3 - FINDINGS AND RECOMMENDATION

discharged, to follow-up with her [primary care physician]." (Tr. 527.)

On December 21, 2005, Gilinsky had abdominal x-rays at Three Rivers Community Hospital in Grants Pass, Oregon. Under the "History of Present Illness" section of his report, Andrew Nicholes, M.D., stated: "The patient is a 49-year-old female who presented to the emergency department with what she stated was pancreatic pain. She has a history of pancreatitis, which is due to her alcoholism. She said her pain started about a week ago. he stopped drinking about five days ago." (Tr. 369.) Because Dr. Nicholes determined that Gilinsky had an intestinal obstruction coupled with abdominal pain, he had Gilinsky admitted to the hospital for intravenous hydration, pain medication, and bowel rest. He also called and discussed the case with Steven Foutz, M.D., Gilinsky's primary care physician.

On December 26, 2005, Dr. Foutz completed a Discharge Summary, which included final diagnoses of (1) "Chronic pancreatitis with an acute episode"; (2) "Alcoholism, chronic, with an acute episode"; (3) "Pulmonary atelectasis causing recurrent fevers in the hospital"; and (4) "Urinary infection with sepsis with Klebsiella." (Tr. 374.) Dr. Foutz also advised Gilinsky to "get some light activity, which will help clear atelectasis and [to] spend her days in some mild busyness as opposed to total bed rest, which . . . will help clear her fevers." (Tr. 374.)

On March 2, 2006, Gilinsky was taken to the emergency room at Providence Medford Medical Center where she was treated for a foot sprain. Although Gilinsky "rate[d] her pain at 9/10 in intensity," x-rays showed no fractures or dislocations. Paul Sage, P.A.,

Page 4 - FINDINGS AND RECOMMENDATION

placed Gilinsky "in an elastic wrap, encouraged her to follow up with Dr. Foutz, and gave her a short course of Vicodin[.]" (Tr. 523.)

On May 9, 2006, visited Dr. Foutz "to discuss her librium which she . . . [takes] to control [her] need for alcohol." (Tr. 348.) At that time, Gilinsky's alcoholism had been in remission for about three months and she reported missing work due to anxiety and vomiting.

On June 29, 2006, Gilinsky was taken to the emergency room at Providence Medford Medical Center where she was treated for alcohol withdrawal. Apparently, Gilinsky was exhibiting "[e]xtremely dramatic behavior, retching in [a] plastic container" and "[r]equesting to drink Gatorade[.]" (Tr. 403.)

Gilinsky returned to visit Dr. Foutz on October 2, 2006, "complaining of pain of several different sorts, including back, right knee, and shoulder pain." (Tr. 349.) Gilinsky reported "that getting up and cleaning her house or cleaning a toilet will relegate her to three days of bed rest." (Tr. 349.) According to Dr. Foutz, "[s]he . . . request[ed] more pain medication and has previously been on oxycodone 5mg." (Tr. 349.) At that time, Gilinsky was also on "Geodon . . . with marked improvement in [her] mental function and ability to abstain from alcohol while on that medicine." (Tr. 349.)

On October 26, 2006, Gilinsky presented to Dr. Foutz "complaining of panic attacks which occur despite Valium 20 mg. a day." (Tr. 350.) Dr. Foutz found it noteworthy that Gilinsky (1) "incidentally later in the interview [revealed] that she is actually taking 20 mg. twice a day"; and (2) had "gone off Geodon,

Page 5 - FINDINGS AND RECOMMENDATION

1  which she was taking for about a year . . . [and] was controlling
2  her anxiety and panic attacks to a considerable degree." (Tr.
3  350.)  He decided to restart Gilinsky's Geodon and continue her
4  prescription for oxycodone.

5      On May 7, 2007, Gilinsky visited Dr. Foutz to request a change
6  of medication.  Because Gilinsky reported no longer receiving any
7  benefits from oxycodone, Dr. Foutz decided to switch her to
8  "methadone at her next refill." (Tr. 351.)  However, Dr. Foutz
9  declined Gilinsky's invitation to switch to Ativan instead of
10 Valium, because "when she was on Ativan a year ago she was
11 hospitalized for pancreatitis and acute alcohol intoxication." (Tr.
12 351.)

13     On July 26, 2007, Gilinsky returned Dr. Foutz's clinic and
14 asked that he change her medication.  Gilinsky reported
15 "difficulty, thinking, concentrating, and poor memory," and said
16 "her medication [was] not relieving her back pain." (Tr. 352.)
17 After noting that Gilinsky's speech was slurred and her gait was
18 unsteady, Dr. Foutz stated: "There is some evidence of intoxication
19 today at 11:30 a.m." (Tr. 352.)

20     On August 23, 2007, Gilinsky was taken to the emergency room
21 at Providence Medford Medical Center where she was treated for
22 alcohol withdrawal.  The admission record indicates that Gilinsky
23 had been drinking 6-10 wine coolers a day, which she attributed to
24 running out Geodon and Valium.  Gilinsky was interviewed by the
25 "hospitalist, Dr. Asudani . . . and together they decided that
26 [Gilinsky] would be better off being discharged and treated for
27 alcohol withdrawal at an outpatient clinic." (Tr. 384.)  According
28 to the discharge summary completed by Peter Thompson, M.D.,

Page 6 - FINDINGS AND RECOMMENDATION

1 Gilinsky "was substantially improved" and able to be discharged on
2 the following medications: Estradol, Ativan, Librium, OxyContin,
3 Geodon, Keflex, Phenergan, and Kay-Ciel. (Tr. 390.)

4      On August 28, 2007, Gilinsky returned for a follow-up visit
5 with Dr. Foutz. Gilinsky said "when she is on Geodon she is able
6 to hold a job, her pain is better controlled, and her drinking is
7 essentially non-existent." (Tr. 353.) However, Gilinsky had been
8 off Geodon for "about six months except for [an] intermittent
9 supply of samples." (Tr. 353.) She also wanted to "switch from
10 Valium to Ativan to control her urge to drink." (Tr. 353.) Dr.
11 Foutz decided to prescribe Gilinsky "Valium 10 mg b.i.d., #30,
12 Ativan 1 mg., #10, to be taken only for panics." (Tr. 353.)

13     On September 17, 2007, Dr. Foutz and Gilinsky "discuss[ed] her
14 bipolar depression." (Tr. 356.) Despite gaining ten pounds in the
15 last two months and four pounds in the last three weeks, Gilinsky
16 told Dr. Foutz she had only been "eating about one meal every
17 second or third day." (Tr. 356.) She also "report[ed] very little
18 if any low back pain on methadone 10 mg." (Tr. 356.)

19     On December 22, 2007, Gilinsky's husband, Dale Gilinsky,
20 prepared a Function Report - Adult - Third Party.[1] He indicated
21 that on a good day, Gilinsky can get up to bathe and watch
22 television. Although Gilinsky can use the toilet by herself, she
23 needs her husband's help getting dressed, preparing meals, and
24 brushing her hair. Gilinsky also needs reminders as to when she
25 needs to take her medicine and bathe. Dale Gilinsky indicated his

26

27     [1]  Gilinsky also completed a Function Report - Adult on
28 January 4, 2008, which contains the same information as the report
prepared by her husband on December 22, 2007.

Page 7 - FINDINGS AND RECOMMENDATION

wife does not do any household chores because she is in too much pain.  In addition, she has difficulty walking "very far" (e.g., longer than half block) and staying focused.  (Tr. 200-02.)  The only time Gilinsky leaves their residence is when Dale Gilinsky takes her to an appointment or to the store with him.  He does all of the couple's shopping and handles their finances because Gilinsky's memory is poor and she cannot add or subtract.[2]

On December 27, 2007, Gilinsky completed a Pain Questionnaire indicating that she has aching and/or stabbing pain in her back, shoulders, elbows, knees, neck, and pancreas.  She experiences this pain on a daily basis, especially after she sits for more than fifteen minutes, performs household chores, vomits or eats certain foods.  Gilinsky reported that pain medication (methadone), rest, sitting in the hot tub, not using her muscles, and walking when possible/ moving around all help alleviate the pain.  Gilinsky estimates that she can be active for fifteen to thirty minutes before she needs to rest.  Gilinsky reported that her lack of mobility impacts her desire to ride horses, clean the house, vacuum, shop, ride a bike, water ski, swim, read, and write.

On March 1, 2008, Gilinsky was examined by Robin Rose, M.D., at the request of the state agency.  During the examination, Dr. Rose noted that Gilinsky did "not easily transfer from the chair to the examination table, groaning when she pushe[d] herself up from the chair." (Tr. 310.)  Gilinsky "walked to the examination room with an antalgic gait and a limp"; however, in Dr. Rose's opinion,

---

[2] During the hearing before the ALJ, Gilinsky testified that she does not add and subtract "as well as [she] used to"; however, she did not state that she was unable to do so.  (Tr. 57.)

1   there was "no evidence of poor effort or inconsistencies."  (Tr.
2   310.)   Overall, based on Gilinsky's fibromyalgia (16/18 trigger
3   points), "low back pain, [and] chronic arthritis in multiple
4   joints," Dr. Rose opined that (1) "[t]he number of hours [Gilinsky]
5   could be expected to stand and walk in an eight-hour workday is one
6   hour"; (2) "[t]he number of hours [Gilinsky] would be able to sit
7   in an eight-hour workday is 1-2 hours"; (3) "[t]he amount of weight
8   [Gilinsky] could lift or carry is five pounds frequently and 10
9   pounds occasionally"; (4) "[t]here are postural limitations on
10  bending, stooping and crouching"; (5) "[t]here are manipulative
11  limitations due to . . . hand pain, the arthritis as well as
12  swelling and possibly weakness"; and (6) "[w]orkplace environmental
13  limitations would be related to the heavy dose of narcotics as well
14  as the chronic pain that might interfere with her ability to focus
15  on tasks."  (Tr. 313.)

16      On March 7, 2008, Gilinsky saw Edwin Pearson, Ph.D., for a
17  Psychodiagnostic Assessment.[3]  During the assessment, Dr. Pearson
18  felt Gilinsky "displayed a minimal amount of pain behavior while
19  seated" and "did not display anxiety at any time during the
20  interview," despite the fact that Gilinsky "complained of anxiety
21  and the potential for anxiety attacks[.]" (Tr. 320.)  On her Mini-
22  Mental State Examination, Gilinsky obtained a score of 26/30.
23  Although Dr. Pearson found Gilinsky to be cooperative and diligent
24  in her participation, he really could not "pin down why [she] is

25

26

27      [3]  Prior to interviewing Gilinsky and administering the Mini-
    Mental State Examination, Dr. Pearson reviewed two pages of her
28  adult function report and Dr. Benson's December 1999
    Psychodiagnostic Evaluation.

Page 9 - FINDINGS AND RECOMMENDATION

having so much trouble with memory[.]" (Tr. 320.) Dr. Pearson's diagnostic impression included diagnoses of "Panic Disorder without Agoraphobia" (Axis I), "Bipolar I Disorder" (Axis I), and "Fibromyalgia, arthritis, pancreatitis, bouts of constipation and diarrhea related to medication affects, [complete] hysterectomy with claimant on hormone replacement, and history of prolapsed bladder repair with current problems suggesting a need for further treatment of the prolapsed bladder" (Axis II). (Tr. 321.) In terms of Gilinsky's capacity to engage in work-related activities, Dr. Pearson opined that Gilinsky would probably (1) "have mild to moderate problems understanding and remembering instructions in an entry-level work environment"; (2) "have at least moderate problems with pace, persistence and concentration because of distracting influences of pain"; and (3) "erratic performance due to unpredictable panic attacks." (Tr. 321.) However, in Dr. Pearson's opinion, Gilinsky's panic attacks and ability to handle social relations "would be even less problematic," as long as she received appropriate medication for her panic disorder and continued to keep her bipolar disorder under control. (Tr. 321.)

On March 24, 2008, Martin Lahr, M.D., a state agency physician, reviewed the medical record and completed a Physical Residual Functional Capacity Assessment ("PRFCA"). With respect to extertional limitations, Dr. Lahr determined that Gilinsky could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk six hours in an 8-hour workday, sit six hours in an 8-hour workday, and push and/or pull "unlimited, other than as shown for lift and/or carry." (Tr. 324.) As to postural limitations, Dr. Lahr determined Gilinsky could frequently climb ramp/stairs,

balance, and stoop, and occasionally climb ladder/rope/scaffolds, kneel, crouch, and crawl.   Dr. Lahr also found that no manipulative, visual, communicative, or environmental limitations were established.

On March 27, 2008, Robert Henry, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment ("MRFCA").   Dr. Henry's MRFCA describes Gilinsky as "[m]oderately [l]imited" in four of twenty categories of mental activity and "[n]ot [s]ignificantly [l]imited" in sixteen.   (Tr. 331-32.)   According to Dr. Henry, Gilinsky is capable of (1) "understanding and remembering simple instructions"; (2) "performing simple 1-2 steps tasks"; (3) making "simple decisions, maintain attention and complete a normal workweek [without] special supervision"; and (4) having occasional contact with "the general public."   (Tr. 333.)

On May 1, 2008, Gilinsky presented to Dr. Foutz "complaining of significant anxiety."   (Tr. 354.)   Gilinsky reported losing a couple of jobs due to her panic attacks.   Dr. Foutz noted that, although Gilinsky smokes two packs of cigarettes a day and does not exercise, "[s]he is planning to walk if she can alleviate or reduce her panic attacks to some degree."   (Tr. 354.)   Ultimately, Dr. Foutz decided to prescribe Gilinsky Seroquel and instructed her to stop taking Lamictal.   (Tr. 354.)

Two weeks later, on May 15, 2008, Gilinsky informed Dr. Foutz that she was experiencing abdominal pain, bloating, nausea, vomiting, and difficulty concentrating after being prescribed Seroquel.   As a result, Dr. Foutz switched Gilinsky to Clonazepam and provided her with a sample of Symbyax.

Page 11 - FINDINGS AND RECOMMENDATION

On September 23, 2008, Gilinsky asked Dr. Foutz for a refill of Clonazepam and an increase in her methadone dosage. At that time, Dr. Foutz stated: "[Gilinsky] is currently capable of performing her own ADL's and is driving. She is also currently performing house cleaning and domestic chores, which appear to be within her capacity. Her [C]lonazepam and methadone are both refilled. Urine tox screen is pending today." (Tr. 357.) Dr. Foutz also suggested that Gilinsky's back and abdominal pain was "partly related to" Gilinsky's alcoholism, which was "reportedly in remission." (Tr. 357.)

On September 11, 2009, Gilinsky was taken to the emergency room at Rogue Valley Medical Center she was treated for an alcohol-related seizure. Gilinsky's discharge instructions were: (1) "[r]egular diet"; (2) "[a]cticity as tolerated, but not driving until she follows up with her primary care provider"; and (3) "[q]uit alcohol consumption entirely." (Tr. 546.) She was also given limited quantities of Clonazepam and Methadone.

On March 10, 2010, Gilinsky's daughter, Angie Lippold ("Lippold"), completed a Witness Statement on her mother's behalf.[4] In terms of activities of daily living, Lippold indicated that Gilinsky cannot lift or move large objects, clean her own house, dial telephone numbers, or drive an automobile. With respect to social functioning, Lippold estimated that Gilinsky's restrictions

---

[4]    Gilinsky's friend, Michelle Hauser ("Hauser"), and Gilinsky's husband provided Witness Statements on March 1 and March 5, 2010, respectively. Dale Gilinsky's and Hauser's witness statements provide information and ratings similar to that of Lippold and will not be detailed in the Factual Background of this Findings and Recommendation.

are marked because she has poor social interactions, isolates herself, and has not been able to hold down a job due to her fibromyalgia-related pain.  In terms of concentration, persistence, or pace, Lippold rated Gilinsky's restictions as extreme due to Gilinsky's pain and fatigue.  Lippold reports that Gilinsky is "tired most of the time," "take[s] naps during the day," and "goes to bed early." (Tr. 261.)  Lastly, Lippold rated Gilinsky's episodes of decompensation as marked. Lippold attributes much of Gilinsky's difficulty to her medications which "make her very tired" and makes her "function ability very low."  (Tr. 262.) Overall, Lippold does not feel that Gilinsky is capable of living alone because she cannot take care of herself.

### B.   Hearing Testimony

#### 1.   Cheryl Gilinsky

During the March 18, 2010 hearing before the ALJ, Gilinsky testified that she was 53 years old and had "two years of college . . . with no degree." (Tr. 35-36.)  In terms of work history, in 1999, Gilinsky worked for the Multnomah County School district as a part-time teacher's aide and as a receptionist/ telemarketer for six months.  After that, Gilinsky worked as a hostess at a restaurant for 3-4 months; provided indoor plant maintenance for a year at Mark Four Enterprises Concepts; worked full-time as a daycare provider from July 2001 to January 2002; managed an apartment complex for two months; worked in the service deli at a local grocery store, on and off for five years; and worked for about a year and a half as a care provider or cook at retirement centers.

In terms of her medical history, Gilinsky said she began having problems with pancreatitis in 1999. Although Gilinsky is no longer "having any trouble with [pancreatitis]," she used to have pain and diarrhea "[p]robably 50 to 75 percent of the time." (Tr. 45-46.) Gilinsky experiences migraines every two months and has a difficult time controlling her bladder. As a result of her bladder condition, Gilinsky sleeps poorly, occasionally wets the bed, and has to bring a change of underwear to work and "wear a pad." (Tr. 47-48.) Gilinsky estimates that she uses the bathroom "20 to 30 times a day at least," or about "eight times to 16 times" during a normal workday. (Tr. 47-48.)

According to Gilinsky, she has had trouble with arthritis in her knees since December 2000. Gilinsky's arthritis-related "flare-ups," which last "a week to 10 days," occur about every two to three months. (Tr. 50.) In 2007, Gilinsky started having problems with her breathing and started using an inhaler. Gilinsky testified that she experiences shortness of breath three times a week, which her doctors attribute to Gilinsky smoking as much as two packs of cigarettes a day. Gilinsky also testified that her knees swell up from time-to-time and she will need assistance climbing stairs. Gilinsky says she does about 40 percent of her household chores, including washing the dishes and folding laundry. Gilinsky estimates that her physical pain has been completely debilitating about 60 percent of the time since December 2000.

In terms of metal impairments, Gilinsky testified that she has suffered from depression since December 2000. Because of her depression and fibromyalgia, Gilinsky says she no longer enjoys activities such as reading, riding horses and gardening. Gilinsky's

Page 14 - FINDINGS AND RECOMMENDATION

1  depression has impacted her energy levels, concentration, weight
2  (she gained twenty-five pounds), and sleep. Gilinsky also
3  testified that she experiences panic attacks twice a week, during
4  which she is "[t]otally dysfunctional" (e.g., vomiting, crying and
5  diarrhea) and "can't do anything except lie down, cover [her] head
6  up, and try to lay really still." (Tr. 56.)

7  *2. Dale Gilinsky*

8  At the time of the hearing before the ALJ, Dale and Cheryl
9  Gilinsky had been married six years. Dale Gilinsky confirmed that
10 his wife has difficulty walking and holding onto objects due to
11 arthritis. He estimates that Gilinsky is in pain about 80 percent
12 of the time. He has also observed that Gilinsky isolates herself
13 in their home and has crying spells four or fives times a week.
14 When questioned as to why his wife had not seen her primary care
15 physician in well over year, Dale Gilinsky responded: "Number one,
16 we haven't had money to see a doctor. And she just got in some
17 kind of insurance, I'm not sure how that works, to go see the
18 doctor." (Tr. 73.) But Dale Gilinsky did concede that neither his
19 wife nor he had inquired about low-income clinics in their area.

20 *3. Henrietta Willingham*

21 Next, the ALJ received testimony from Gilinsky's mother-in-
22 law, Henrietta Willingham ("Willingham").[5] Gilinsky moved into the
23 same town as Willingham about four years ago and they see each
24 other "sometimes every day, sometimes two days a week, sometimes
25 three days, sometimes not for two weeks . . . depending on how
26 [Gilinsky is] feeling." (Tr. 74.) Willingham has observed that

27 ———————————

28  [5]  Gilinsky's counsel's opening brief incorrectly refers to
    Willingham as Gilinsky's daughter-in-law. (Pl.'s Br. at 11.)

Page 15 - FINDINGS AND RECOMMENDATION

1 Gilinsky has trouble walking and "do[es] not believe she could walk
2 a city block without resting." (Tr. 75.)  In Willingham's opinion,
3 Gilinsky's ability to function has "diminished considerably the
4 last years" and now she "just sits and cries."  (Tr. 76.)

5 ### 4.  *Vocational Expert*

6     Lastly, the ALJ received testimony from Vocational Expert
7 ("VE"), Frank Lucas ("Lucas"), at the March 18, 2010 hearing.  At
8 the outset, the VE eliminated Gilinsky's job as a cook and
9 apartment manager from consideration as past relevant work because
10 the specific vocational preparation ("SVP") "suggests that she did
11 not work at the jobs long enough to acquire skills to be considered
12 fully qualified to do those jobs." (Tr. 78.)  However, according
13 to the VE, Gilinsky performed the following positions on a
14 consistent enough basis to qualify as past relevant work: plant
15 tender (SVP of 3, medium level work), babysitter (SVP of 3, medium
16 level work), personal care aide (SVP of 4, medium level work),
17 receptionist (SVP of 3, light work), telemarketer (SVP of 3,
18 sedentary work), counter attendant (SVP of 3, light work), buffet
19 hostess/ cashier (SVP of 2, light work), and teacher aide (SVP of
20 3, light work).

21     The ALJ first asked the VE to consider a person of Gilinsky's
22 age, education and vocational background, who is limited to
23 standing and walking "one hour in an eight hour workday," sitting
24 "two hours in an eight hour workday," and lifting five to ten
25 pounds.  The VE stated that such an individual could not perform
26 any of Gilinsky's past relevant work, nor could they work in any
27 other position on a sustained basis.  The ALJ then asked the VE to

28

Page 16 - FINDINGS AND RECOMMENDATION

consider a person of Gilinsky's age, education and vocational background, with the following limitations:

> [L]ifting and carrying [up] to 20 pounds occasionally, 10 pounds frequently. Standing and walking . . . six hours in an eight hour workday. Sitting . . . about six hours in an eight hour workday. Pushing and pulling are limited by weight. The following postural limitations are occasional . . . climbing of ladders, ropes, and scaffolds; kneeling, crouching, crawling. And climbing of ramps, stairs, balancing or stopping would be frequent[.] . . . [T]here needs to be an avoidance of concentrated exposure to hazards which could be heights or moving machinery. . . . [L]imit[ed] to performing simple, one [or] two step tasks and duties . . . [with] only occasional contact with the general public.

(Tr. 80.)  The VE testified that an individual with such limitations could perform the jobs of egg washer, motel maid, and route clerk, which existed in substantial numbers in the national economy.

### III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.  Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Comm'r Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520)).  The *Keyser* court described the five-step process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula- tions?  (4) Is the claimant able to perform any work that

Page 17 - FINDINGS AND RECOMMENDATION

1  he or she has done in the past? and (5) Are there
2  significant numbers of jobs in the national economy that
   the claimant can perform?

3  *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,
4  1098-99 (9th Cir. 1999)).  The claimant bears the burden of proof
5  for the first four steps in the process.  If the claimant fails to
6  meet the burden at any of those four steps, then the claimant is
7  not disabled.  *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th
8  Cir. 2001); *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct.
9  2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and
10 416.920(g) (setting forth general standards for evaluating
11 disability), 404.1566 and 416.966 (describing "work which exists in
12 the national economy"), and 416.960(c) (discussing how a claimant's
13 vocational background figures into the disability determination).

14 The Commissioner bears the burden of proof at step five of the
15 process, where the Commissioner must show the claimant can perform
16 other work that exists in significant numbers in the national
17 economy, "taking into consideration the claimant's residual
18 functional capacity, age, education, and word experience." *Tackett*
19 *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
20 fails meet this burden, then the claimant is disabled, but if the
21 Commissioner proves the claimant is able to perform other work
22 which exists in the national economy, then the claimant is not
23 disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
24 §§ 404.1520(f), 416.920(f)); *Tackett*, 180 F.3d at 1098-99).

25 The ALJ determines the credibility of the medical testimony
26 and also resolves any conflicts in the evidence.  *Batson v. Comm'r*
27 *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
28 *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

Page 18 - FINDINGS AND RECOMMENDATION

Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions where they are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). "[T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. . . . [And,] the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (citations and internal quotation marks omitted).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.  The ALJ's Decision

At the first step of the five-step sequential evaluation process, the ALJ found that Gilinsky had not engaged in substantial gainful activity since December 31, 2000, the alleged disability

onset date.  At the second step, the ALJ found that Gilinsky had the following severe impairments: arthritis, alcohol-related pancreatitis, fibromyalgia with some neuropathy, alcoholism with withdrawal complications, bipolar disorder, and anxiety disorder. At the third step, the ALJ found that Gilinsky's combination of impairments were not the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  The ALJ therefore assessed Gilinsky as having the residual functional capacity ("RFC") to

> perform light work . . . except that the claimant can occasionally climb ladders, ropes, and scaffolds, kneel, crouch, and crawl, must avoid concentrated exposure to workplace hazards, is capable of understanding, remembering, and performing simple (1 to 2-step) tasks, and is capable of occasional contact with the general public.

(Tr. 18.)  At the fourth step of the five-step process, the ALJ found that Gilinsky is unable to perform any past relevant work. At the fifth step, the ALJ found in light of Gilinsky's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform, including an egg washer, motel maid, and route clerk.  Based on the finding that Gilinsky could perform jobs existing in significant numbers in the national economy, the ALJ concluded that she was not disabled as defined in the Act from December 31, 2000, through May 19, 2010.

### IV.  STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec.*

*Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r*, 433 F. App'x 614, 615 (9th Cir. 2011).  Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'"  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions.  *Id.*  However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## *V.   DISCUSSION*

Gilinsky asserts five grounds upon which the ALJ's decision should be reversed: (1) the ALJ conducted an improper evaluation of Gilinsky's past alcohol abuse; (2) the ALJ's adverse credibility determination was improper; (3) the ALJ inadequately considered the PRFCA prepared by Dr. Rose; (4) the ALJ improperly rejected lay witness testimony; and (5) the ALJ failed to comply with Social Security Ruling ("SSR") 96-8p in assessing Gilinsky's RFC.

### *A.   The Drug Abuse and Alcoholism Analysis*

When a claimant has substance abuse issues that may contribute to a finding of disability, the ALJ is required to conduct a drug

abuse and alcoholism analysis ("DAA analysis") pursuant to 42
U.S.C. § 423(d)(2)(c). Gilinsky argues that the ALJ was required
to conduct the DAA analysis simply because he indicated that
"alcoholism [was] material to [Gilinsky's] physical limitations."
(Tr. 21.) The Commissioner argues the DAA analysis is not required
where, as here, the ALJ determines that the claimant is not
disabled.

The Social Security regulations provide that, "[i]f we find
that you are disabled and have medical evidence of your drug
addiction or alcoholism, we must determine whether your drug
addiction or alcoholism is a contributing factor material to the
determination of disability." 20 C.F.R. § 404.1535(a). However,
as the Ninth Circuit recognized in *Bustamante*, the "regulations
make clear that a finding of disability is a condition precedent to
an application" of the DAA analysis. *Bustamante*, 262 F.3d at 955
(citations omitted). In this case, the ALJ did not find that
Gilinsky was disabled at step five. Accordingly, Gilinsky's
argument that the ALJ erred in failing to conduct the DAA analysis
is without merit. *See Evans v. Astrue*, No. 10-cv-690-TLW, 2012 WL
1114622, at *8 (N.D. Okla. Mar. 28, 2012) (same).

### B. *Adverse Credibility Determination*

Gilinsky argues that the ALJ improperly discredited her
symptom testimony. An ALJ may only reject a claimant's testimony
concerning the severity of her symptoms "by offering, specific,
clear and convincing reasons for doing so." *Lingenfelter v.
Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) In making this
determination, an "ALJ may consider, for example: (1) ordinary
techniques of credibility evaluation, such as the claimant's

Page 22 - FINDINGS AND RECOMMENDATION

reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen*, 80 F.3d at 1284.  If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

In this case, the ALJ gave specific, clear and convincing reasons for discounting Gilinsky's testimony.  In addition to finding a lack of objective medical evidence to support Gilinsky's description of her pain and limitations, the ALJ noted that Gilinsky offered testimony that appeared less than candid.  For example, during the March 2010 hearing, Gilinsky testified that she had not drank since December 24, 2009.  (Tr. 68.)  However, in an April 15, 2010 questionnaire, Gilinsky claimed a sobriety date of September 11, 2009, with the exception of "1 time in the . . . 3 months" prior to April 2010.  (Tr. 303); *see Verduzco v. Apfel*, 188 F.3d, 1087, 1090 (9th Cir. 1999) (relying on inconsistent statements about alcohol use to reject claimant's testimony).  In that same April 2010 questionnaire, Gilinsky denied ever experiencing alcohol withdrawal symptoms, even though the record clearly indicates Gilinsky was taken to the emergency room on more than one occasion complaining of such symptoms (e.g., June 29, 2006 and August 23, 2007).

Additionally, the ALJ discounted Gilinsky's credibility based on her activities of daily living and Dr. Foutz's reports.  *See Crane v. Barnhart*, 224 F. App'x 574, 577 (9th Cir. (Or.) 2007)

Page 23 - FINDINGS AND RECOMMENDATION

(recognizing that an ALJ may discredit subjective symptom testimony based on the plaintiff's "activities of daily living" and "reports of physicians that contradicted [the plaintiff]'s claimed limitations.")  For example, after Gilinsky visited Dr. Foutz for the last time in September 2008 (i.e., nearly one year after applying for disability benefits and almost eight years after her alleged disability onset date), Dr. Foutz stated: "[Gilinsky] is currently capable of performing her own ADL's and is driving.  She is also currently performing house cleaning and domestic chores, which appear to be within her capacity."[6]  (Tr. 357); *see Thomas*, 278 F.3d at 959 (determining that substantial evidence supports the ALJ's negative conclusion about the claimant's veracity based, in part, on her ability to perform various household chores).

In short, I conclude that to the extent the ALJ rejected Gilinsky's testimony, he provided clear and convincing reasons for doing so.

## C.  Dr. Rose's Physical Residual Functional Capacity Assessment

Gilinsky next argues that the ALJ improperly rejected the medical findings of the examining doctor, Dr. Rose.  It is well settled that "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons[.]"  *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted).

---

[6] During the March 2010 hearing before the ALJ, Gilinsky stated: "It seems like I've seen [Dr. Foutz] once or twice" since September 2008.  (Tr. 43.)  But Gilinsky later confirmed there was no record of a consultation with Dr. Foutz during that time period. (*See* Tr. 43-45) (indicating that the ALJ had "all the records up to date except for" the record pertaining to Gilinsky's upcoming appointment with a psychologist on March 24, 2010).

In this case, the ALJ gave sufficient reasons, supported by substantial evidence in the present record, for rejecting Dr. Rose's opinion. The ALJ gave Dr. Rose's opinion "very limited weight as it is inconsistent with the other medical evidence of record, especially the claimant's reports to her primary care physician about her level of activity."  (Tr. 20.)

For example, Dr. Rose's March 2008 PRFCA indicates that (1) "[t]he number of hours [Gilinsky] could be expected to stand and walk in an eight-hour workday is one hour"; (2) "[t]he number of hours [Gilinsky] would be able to sit in an eight-hour workday is 1-2 hours"; (3) "[t]he amount of weight [Gilinsky] could lift or carry is five pounds frequently and 10 pounds occasionally"; (4) "[t]here are postural limitations on bending, stooping and crouching"; (5) "[t]here are manipulative limitations due to . . . hand pain, the arthritis as well as swelling and possibly weakness"; and (6) "[w]orkplace environmental limitations would be related to the heavy dose of narcotics as well as the chronic pain that might interfere with her ability to focus on tasks."  (Tr. 313.)

By contrast, Dr. Lahr's March 2008 PRFCA -- an assessment which the ALJ gave "significant weight" to -- indicates Gilinsky can occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk six hours in an 8-hour workday, sit six hours in an 8-hour workday, and push and/or pull "unlimited, other than as shown for lift and/or carry."[7]   (Tr. 324.)  As to postural limitations, Dr. Lahr determined Gilinsky can frequently climb

---

[7] (*See* Tr. 22) (citing, and assigning "significant weight" to, Ex. 4F, which is Dr. Lahr's March 2008 PRFCA).

1 ramp/stairs, balance, and stoop, and occasionally climb
2 ladder/rope/scaffolds, kneel, crouch, and crawl.  Dr. Lahr also
3 found that no manipulative, visual, communicative, or environmental
4 limitations were established.

5      Furthermore, and contrary to Dr. Rose's March 2008 PRFCA,
6 Gilinsky's long-time treating physician, Dr. Foutz, made the
7 following observation in September 2008: "[Gilinsky] is currently
8 capable of performing her own ADL's and is driving.  She is also
9 currently performing house cleaning and domestic chores, which
10 appear to be within her capacity."  (Tr. 357.)

11      In short, I conclude that the ALJ provided specific and
12 legitimate reasons, supported by substantial evidence in the
13 present record, for rejecting Dr. Rose's opinion.  *See Tonapetyan*,
14 242 F.3d at 1149 ("Although the contrary opinion of a non-examining
15 medical expert does not alone constitute a specific, legitimate
16 reason for rejecting a treating or examining physician's opinion,
17 it may constitute substantial evidence when it is consistent with
18 other independent evidence in the record.")

### D.  Lay Witness Testimony

20      Gilinsky contends that the ALJ erred in dismissing the lay
21 testimony of Dale Gilinsky, Hauser, and Lippold.  "An ALJ need only
22 give germane reasons for discrediting the testimony of lay
23 witnesses."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.
24 2005).

25      The ALJ's written decision discussed Dale Gilinsky's
26 testimony; however, the ALJ never indicated specifically whether he
27 rejected, or was assigning "less weight" to, Dale Gilinsky's
28 testimony.  To this end, *Ware v. Astrue*, No. EDCV 11-457-OP, 2011

Page 26 - FINDINGS AND RECOMMENDATION

1   WL 51653905 (C.D. Cal. Oct. 26, 2011), is instructive.  In that

2   case, the claimant argued that the ALJ erred by ignoring lay

3   testimony provided by his girlfriend, Alicia Ramirez.  *Id.* at *5.

4   The *Ware* court rejected this argument, stating: "Where, as here,

5   the lay witness testimony mirrors the claimant's testimony and the

6   claimant is found to be not credible, the ALJ may reject the lay

7   witness testimony for that reason alone. . . . Thus, the Court

8   finds that the valid reasons given by the ALJ to reject Plaintiff's

9   credibility, also legitimately support his implicit rejection of

10  Plaintiff's girlfriend's credibility."  *Id.* (internal citation

11  omitted).

12      Applying *Ware* to the present case, I conclude that the ALJ's

13  treatment of Dale Gilinsky's testimony does not require reversal

14  because the valid reasons given by the ALJ to reject Gilinsky's

15  testimony, also support his implicit rejection of Dale Gilinsky's

16  credibility.  *See Ware*, 2011 WL 5165390, at *5 ("holding that ALJ

17  gave [a] germane reason for rejecting claimant's wife's testimony

18  where it was similar to claimant's own complaints that were

19  properly rejected" (citing *Valentine v. Comm'r of Soc. Sec. Admin.*,

20  574 F.3d 685, 694 (9th Cir. 2009))).

21      With respect to Hauser and Lippold, the ALJ's entire

22  discussion of their testimony is as follows:

23      Ms. Hauser asserts that the claimant has marked
        difficulties in activities of daily living and social
24      functioning and 'extreme' difficulties in concentration.
        She asserts that the claimant feels like an outsider, has
25      emotional meltdowns, and does not finish tasks. . . . Ms.
        Lippold has known the claimant for 33 years and assessed
26      marked difficulties in all these areas [as well]. The
        undersigned gives these lay witness opinions no weight,
27      as this level of impaired functioning is *unsupported* in
        the record.

28

Page 27 - FINDINGS AND RECOMMENDATION

1  (Tr. 19.)

2      As this court explained in *Foland v. Astrue*, No. 10-1495-HZ,
3  2011 WL 6778771 (D. Or. Dec. 23, 2011), an "ALJ may reject lay
4  testimony that directly conflicts, or is inconsistent with, the
5  medical evidence"; however, an "ALJ may not reject lay testimony
6  merely because it is uncorroborated, or unsupported, by the medical
7  evidence." *Foland,* 2011 WL 6778771, at *9 (citations omitted).  In
8  this case, the ALJ arguably did the latter, insofar as his language
9  "unsupported in the record" would include "unsupported by the
10  medical evidence."

11      Nevertheless, harmless error analysis may apply when an ALJ
12  disregards a lay witness's testimony.  *Stout v. Comm'r Soc. Sec.*,
13  454 F.3d 1050, 1054 (9th Cir. 2006) ("[W]here the ALJ's error lies
14  in a failure to properly discuss competent lay testimony favorable
15  to the claimant, a reviewing court cannot consider the error
16  harmless unless it can confidently conclude that no reasonable ALJ,
17  when fully crediting the testimony, could have reached a different
18  disability determination").  Upon review, I conclude that "the
19  ALJ's error was harmless because even if the ALJ fully credited
20  [the lay witness's] testimony, there was other significant evidence
21  that supported the ALJ's nondisability determination." *Graham v.*
22  *Comm'r Soc. Sec.*, 441 F. App'x 487, 489 (9th Cir. (Or.) 2011). Most
23  notably, Gilinsky's treating physician's observations regarding
24  Gilinsky's ability to perform her activities of daily living, which
25  were based in part on Gilinsky's own reports, and Dr. Lahr's March
26  2008 PRFCA support the finding Gilinsky is not disabled.  Further,
27  Hauser's and Lippold's testimony concerning Gilinsky's symptoms
28  were pretty much duplicative of evidence in the record reviewed by

Page 28 - FINDINGS AND RECOMMENDATION

1  the ALJ.  *See Graham*, 441 F. App'x at 489 (making similar
2  observations).  Because the Hauser's and Lippold's statements were
3  inconsequential to the ultimate disability findings, the ALJ's
4  error was harmless.

5      Had the ALJ simply said that Hauser's and Lippold's testimony
6  was inconsistent with the medical record based on the examples
7  provided (as opposed to unsupported by it), I would conclude that
8  he did not err.  Changing "inconsistent" to "unsupported" should
9  not change the ALJ's conclusion, nor the results.

10          ***E.  Social Security Ruling 96-8p***

11      Lastly, Gilinsky argues that the ALJ failed to comply with the
12  requirements of SSR 96-8p in determining her RFC.  In support of
13  her position, Gilinsky relies primarily on the fact that the VE
14  testified that an individual with the limitations set forth in Dr.
15  Rose's PRFCA would be disabled.

16      It is well settled that the hypothetical an ALJ poses to a VE,
17  which derives from the RFC, "must set out all the limitations and
18  restrictions of the particular claimant."  *Embrey v. Bowen*, 849
19  F.2d 418, 422 (9th Cir. 1988).  "While the ALJ may pose to the
20  expert a range of hypothetical questions, based on alternate
21  interpretations of the evidence, substantial evidence must support
22  the hypothetical which ultimately serves as the basis for the ALJ's
23  determination."  *Moua v. Astrue*, CIV S-07-2024 GGH, 2009 WL 997104,
24  at *11 (E.D. Cal. Apr. 14, 2009).

25      In this case, substantial evidence supports the VE
26  hypothetical which served as the basis for the ALJ's disability
27  finding.  It is the ALJ's obligation to determine a claimant's RFC
28  (e.g., a summary of what the claimant is capable of doing) and he

Page 29 - FINDINGS AND RECOMMENDATION

1  may incorporate the RFC into the VE hypothetical.  *Valentine*, 574

2  F.3d at 689.  The ALJ did exactly that.  In his second hypothetical

3  (based in large part on Dr. Lahr's PRFCA which he gave "significant

4  weight"), the ALJ asked the VE to consider a person of Gilinsky's

5  age, education and vocational background, with the following

6  limitations:

7       [L]ifting and carrying [up] to 20 pounds occasionally, 10
        pounds frequently.  Standing and walking . . . six hours
8       in an eight hour workday.  Sitting . . . about six hours
        in an eight hour workday.  Pushing and pulling are
9       limited by weight.  The following postural limitations
        are occasional . . . climbing of ladders, ropes, and
10      scaffolds; kneeling, crouching, crawling.  And climbing
        of ramps, stairs, balancing or stopping would be
11      frequent[.] . . . [T]here needs to be an avoidance of
        concentrated exposure to hazards which could be heights
12      or moving machinery. . . . [L]imit[ed] to performing
        simple, one [or] two step tasks and duties . . . [with]
13      only occasional contact with the general public.

14  (Tr. 80.)  The VE stated that the jobs of egg washer, motel maid,

15  and route clerk existed in substantial numbers in the national

16  economy.

17      Because the ALJ properly rejected evidence of Gilinsky's

18  impairments (derived from Dr. Rose's PRFCA), as discussed above,

19  the ALJ did not err by failing to rely on the hypothetical based

20  upon those impairments, nor did he err by failing to alter

21  Gilinsky's RFC to reflect such impairments.

22                    *VI.  CONCLUSION*

23      Following a careful review of the record, I conclude that the

24  Commissioner's decision should be **AFFIRMED**.

25                 *VII.  SCHEDULING ORDER*

26      The Findings and Recommendation will be referred to a district

27  judge.  Objections, if any, are due **October 1, 2012**.  If no

28  objections are filed, then the Findings and Recommendation will go

Page 30 - FINDINGS AND RECOMMENDATION

1  under advisement on that date.  If objections are filed, then a

2  response is due **October 18, 2012.** When the response is due or

3  filed, whichever date is earlier, the Findings and Recommendation

4  will go under advisement.

5      Dated this 11th day of September, 2012.

6                              /s/ Dennis J. Hubel

7                         _____

8                              DENNIS J. HUBEL
                         United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 31 - FINDINGS AND RECOMMENDATION